1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10

11   JAMES ROBERT BARKACS,              )     Civil No. 07cv2139 JAH  (WMc)
                                        )
                      Plaintiff,        )     **REPORT AND RECOMMENDATION**
12   v.                                 )     **OF UNITED STATES MAGISTRATE**
                                        )     **JUDGE RE: DENIAL OF PETITION**
13   D. ADAMS (Warden),                 )     **FOR WRIT OF HABEAS CORPUS**
                                        )
14                    Defendants.       )
                                        )
15   ─────────────────────────────────  )

16                            **I.  INTRODUCTION**

17          This Report and Recommendation is submitted to United States District Judge John A. Houston

18   pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the

19   Southern District of California.

20          James Robert Barkacs (hereinafter "Petitioner") is a California state prisoner proceeding *pro se*

21   with a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.

22   (Pet.; Doc. No. 1).  Petitioner alleges that his Constitutional rights were violated by: 1) failure to give

23   requested defense jury instructions; 2) failure to excuse a juror during trial; and 3) erroneous admission

24   of highly prejudicial information. (Pet. at 6-11[1]; Doc. No. 1).

25          Respondent filed an Answer to the Petition, accompanied by a Memorandum of Points and

26   Authorities in support thereof, and has lodged portions of the state court record.  (Ans.; Mem. P. & A.

27
────────────────
28          [1]  Due to the inclusion of additional pages within the standard form Petition for Writ of Habeas Corpus, the court will refer to
     the pagination supplied by the CM/ECF system when referencing particular pages of the Petition.

Supp. Ans.; Lodgment; Doc. No. 13)  Respondent asserts that Petitioner is not entitled to habeas relief

since the state court proceedings were neither contrary to, nor an unreasonable application of, clearly

established federal law.  Specifically, Respondent claims that 1) Petitioner was not entitled to the

requested jury instructions since the defense theory was neither legally sound nor supported by evidence

in the record; 2) Petitioner failed to demonstrate that Juror No. 5 was improperly biased; and 3)

evidentiary errors do not warrant federal habeas relief.  (Ans. at 9-20; Doc. No. 13)

After reviewing the Petition, Respondent's Answer and Memorandum of Points and Authorities,

and all supporting documents submitted by the parties, the Court recommends the Petition be **DENIED**

for the reasons stated below.

## II.  PROCEDURAL HISTORY

Petitioner was convicted in the San Diego Superior Court on April 6, 2005 for one count of first

degree murder (CAL. PENAL CODE §187(a)) with the special circumstance that it was committed during

the commission of a carjacking (CAL. PENAL CODE §190.2(a)(17), one count of carjacking (CAL. PENAL

CODE §215(a)) and one count of arson (CAL. PENAL CODE §451 (d)).  (Lodgment 1, Clerk's Transcript at

120-23).

Following the conviction in state trial court, Petitioner immediately filed a Notice of Appeal on

April 6, 2005.  An opening brief was submitted by the Petitioner to the Court of Appeals, Fourth

Appellate District, Division One on March 8, 2006.  (Lodgment 6).  The basis for Petitioner's appeal

involved the same three claims asserted in this petition.  (Lodgment 6).  A response brief, on behalf of

the People of the State of California, was submitted on July 7, 2006.  (Lodgment 7).  An unpublished

opinion of the California Court of Appeal was filed on November 30, 2006, which denied Petitioner

relief and affirmed his conviction.  (Lodgment 2).

Petitioner submitted a Petition for Review to the California Supreme Court on January 16, 2007.

(Lodgment 3).  The same claims were raised by Petitioner in that appeal as were raised in the first

appeal and are raised in the current petition. (Lodgment 3).  The California Supreme Court denied the

petition without comment on March 14, 2007. (Lodgment 4).

With his state court remedies exhausted, Petitioner filed the current Petition for Writ of Habeas

Corpus on November 7, 2007.  (Pet.; Doc. No. 1).  The current Petition asserts the same claims as were

1   asserted in the state court appeals.  (Pet.; Doc. No. 1).  Respondent filed an Answer to Petition for Writ

2   of Habeas Corpus with a Memorandum of Points and Authorities on May 7, 2008.  (Ans.; Doc. No. 13).

3   Respondent also filed the Notice of Lodgment concurrently with the Answer on May 7, 2008. (Lodg-

4   ment).  Petitioner thereafter filed a Traverse in Reply to Respondent's Answer with a Memorandum of

5   Points and Authorities on June 24, 2008. (Traverse; Doc. No. 16).

6   ### III.  STATEMENT OF FACTS

7         The following statement of facts is summarized from the unpublished opinion of the appellate

8   court affirming Petitioner's conviction on direct review. (Lodgment 2).  On habeas review, this Court is

9   to give great deference to the factual findings of the state court and presume those findings to be correct.

10  28 U.S.C. §2254(e)(1); See also Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that deference is

11  owed to factual findings of both state trial and appellate courts).

12  *Events of October 2, 2003*

13        On October 2, 2003, at approximately 10:30 p.m., Petitioner was looking for a car to take to find his girlfriend, Linda Lott.  Petitioner's friend, Calvin Pete,

14  observed Petitioner first get into a Trans Am and unsuccessfully try to start it. Pete, then, observed Petitioner get into a car parked in the driveway of a nearby

15  motel.  As Petitioner attempted to drive away with the car, the owner, Pablo Cruz, jumped on the driver's side of the car in an attempt to stop Petitioner.  After the car swerved several times, Cruz fell off the car and Petitioner drove away.

16        Following this incident, Petitioner met with his father, William Barkacs, at the motel where he lived.  Petitioner called Pete, and Pete went to see Petitioner.

17        Meanwhile, paramedics had transported Cruz to a nearby hospital for immediate treatment.  Dr. Frank Kennedy, a trauma surgeon, noted that Cruz was

18  unresponsive and had a laceration to the head.  Treatment continued throughout the week, but Dr. Kennedy testified that Cruz's chances of survival were "very

19  low."

20  *Events of October 3, 2003*

21        At approximately 3:18 a.m. on the morning of October 3, 2003, Cruz's car was discovered, on fire, by firefighters.  The subsequent investigation by fire

22  investigator Russell Steppe determined that the fire was deliberately set and probably started by an open flame which ignited flammable material.

23  *Events of October 9, 2003*

24        On October 9, 2003, Dr. Kennedy had a discussion with Cruz's family members concerning Cruz's medical condition.  Following this discussion, Cruz's

25  family members requested that the doctors discontinue the aggressive care they had been giving to Cruz.  At approximately 1:00 p.m. that day, doctors removed

26  the breathing machine which Cruz had been connected to since arriving at the hospital and ceased all medication.  Cruz was given 10 milligrams of morphine to alleviate any discomfort.  Cruz ultimately died at 2:04 p.m. the same day.

27  *Events of October 10, 2003*

28        An autopsy was conducted on Cruz by Dr. Christina Stanley on October

10, 2003.  The subsequent report and testimony concluded that the cause of Cruz's death was blunt force head injuries.

*Events during trial*
        At trial, the defense presented testimony from Dr. Harry Bonnell, a forensic pathologist and former chief deputy medical examiner for the County of San Diego, concerning Cruz's medical treatment and cause of death.  Dr. Bonnell noted that the immediate neurosurgery performed on Cruz "certainly saved [Cruz's] life..."  Further, Dr. Bonnell noted that Cruz's medical records showed that Cruz was given 10 milligrams of morphine just before the respirator was removed on October 9, 2003 and another 10 milligrams of morphine at 2:00 p.m. Dr. Bonnell testified that morphine depresses respiratory activity.  Dr. Bonnell classified the cause of Cruz's death as "acute–respiratory depression due to acute morphine toxicity due to blunt impact to the head."

(Lodgment 2 at 2-7)

# IV.  STANDARD OF REVIEW

The general scope of review on federal habeas corpus petitions is set forth in 28 U.S.C. §2254(a), as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Since the petition was filed after the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 (hereafter "AEDPA"), it is subject to the provisions of the AEDPA.  Pub. L. No. 104-132, 110 Stat. 1214.  The AEDPA  amended 28 U.S.C. §2254, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>         (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>         (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Accordingly, a writ will not be granted unless it is shown that the state court adjudication was either contrary to or involved an unreasonable application of clearly established federal law.  "Clearly

4

established federal law" is determined by viewing the U.S. Supreme Court's decisions at the time of the conviction.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Opinions of the Ninth Circuit may also be relied upon as persuasive authority as to whether a state court decision is an unreasonable application of Supreme Court law and may also help establish what law is clearly established.  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

The state court's adjudication of an issue will be deemed "contrary to" such clearly established federal law if either: 1) a different rule is applied or 2) the correct rule is identified but mis-applied in such a way that a different result is reached despite being based on indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lockyer, 538 U.S. at 73; Clark, 331 F.3d at 1067.  Alternatively, a State court's adjudication will be deemed to have involved an "unreasonable application of" clearly established federal law if the correct legal rule is identified but was either: 1) applied unreasonably to the facts, 2) unreasonably extended to govern the facts, or 3) unreasonably constrained so as not to apply to the facts. Williams, 529 U.S. at 407-08.

Additionally, a federal reviewing court may also grant habeas relief if the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented.  In a petition seeking relief under this standard, the petitioner bears the burden of proving that the factual determinations of the state court were objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

When a petition for review is made to the highest state court and that court responds with a silent denial, the federal habeas court can "look through" the silent denial to the last reasoned state court's decision in order to consider whether habeas relief is warranted.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).  In the instant case, Petitioner had submitted a petition for review to the California Supreme Court, and the California Supreme Court issued a silent denial of the petition.  (Lodgment 3-4). As such, this court will look to the California Court of Appeal opinion in making its habeas determinations.

## V.  DISCUSSION

**A. Petitioner Is Not Entitled to Relief on His First Claim**

*1. Summary of Claims*

Petitioner alleges the refusal of the trial court to instruct the jury in accordance with Petitioner's

special instructions, modifying CALJIC 3.40 and 3.41 and adding an instruction regarding euthanasia in California, violated his rights under the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.  Specifically, Petitioner alleges the actions of Dr. Kennedy, in removing the life-sustaining equipment and ordering the increase in morphine dosage, were independent intervening acts which caused Pablo Cruz's death.  (Pet. at 6-8; Traverse at 3-4).   Accordingly, Petitioner alleges that the failure of the trial court to properly instruct the jury as to the legal significance of these acts amounted to a deprivation of Petitioner's right to present a meaningful defense under the Due Process Clauses of the U.S. Constitution.  (Pet. at 6-8; Traverse at 3-4).

Respondent asserts the refusal of the trial court to give the proposed defense jury instructions was consistent with federal law.  Specifically, Respondent concedes that while Petitioner is entitled to adequate instructions on the defense theory of the case, such instructions are given only if the theory is legally sound and supported by the evidence, neither of which was satisfied in the current case.  (Ans. at 13-14).

In an unpublished opinion, the California Court of Appeal denied Petitioner's claims on the grounds that Petitioner's proposed defense theory was not supported by any evidence in the case. (Lodgment 2 at 16-17).

*2. Statement of Relevant Facts*

The following statement of facts is taken verbatim from the unpublished opinion of the appellate court affirming Petitioner's conviction on direct review, and is to be given the presumption of correctness. 28 U.S.C. §2254(e)(1); See also Sumner, 449 U.S. at 545-47.

"Near the end of the trial, outside the presence of the jury, the court stated that it had conducted an off-the-record conference with defense counsel and the prosecutor regarding jury instructions.  The court indicated that it would review on the record the jury instructions it intended to give, and that defense counsel and the prosecutor would have the opportunity to comment, question, or object to any of the proposed instructions at that time.

"The trial court stated that it intended to instruct the jury pursuant to CALJIC Nos. 3.40 and 3.41 regarding causation.  CALJIC No. 3.40 provides:

'[To constitute the crime of _____ there must be in addition to the (result of the crime) an unlawful [act] [or] [omission] which was a cause of that (result of the crime).]

'The criminal law has its own particular way of defining cause. A cause of the (result of the crime) is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) and without which the (result of the crime) would not occur.'

"CALJIC No. 3.41 provides:

'There may be more than one cause of the (result of the crime). When the conduct of two or more persons contributes concurrently as a cause of the (result of the crime), the conduct of each is a cause of the (result of the crime) if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the (result of the crime) and acted with another cause to produce the (result of the crime).

'[If you find that the defendant's conduct was a cause of (injury, death, etc.) to another person, then it is no defense that the conduct of some other person [, even the [injured] [deceased] person,] contributed to the (injury, death, etc.).]'

"Defense counsel objected to the court's proposed instructions, and requested that the court instruct the jury pursuant to modified versions of CALJIC Nos. 3.40 and 3.41. Defense counsel's modified version of CALJIC No. 3.40 stated the standard instruction and added the following four paragraphs:

'A person who has injured another is not responsible for the other's death, even though the death would not have occurred but for the injury, if the death is the result of some other independent intervening cause.

'In this case you must decide from the evidence whether the acts of the doctors treating Pablo Cruz constituted an independent intervening cause, so that those acts, rather than any act by the defendant were the cause of Cruz'[s] death.

'Whether an intervening cause is independent, and is therefore regarded as the cause of a death, depends on whether it is a normal and reasonably foreseeable result of the defendant's original act. An intervening cause need not be unlawful or a violation of a duty in order to be independent within the meaning of this instruction.

'If after considering all of the evidence, you have a reasonable doubt as to whether an act of the defendant was the cause of Cruz'[s] death, you must give the defendant the benefit of that doubt and find that his act was not the cause.'

"Defense counsel's modified version of CALJIC No. 3.41 stated the standard instruction, with the following two paragraphs added:

'Evidence has been presented from which you may find that the defendant's act was a cause of the death but that the immediate cause of the death was the unlawful (intentional) conduct of another person. You may not convict the defendant based on such a

7

finding unless you also find that when the defendant committed the act which was a cause of the death the intervening unlawful (intentional) act of the other person would have been reasonably foreseeable to a reasonable person in the same position as the defendant.

'If you have a reasonable doubt whether the intervening unlawful (intentional) act would have been reasonably foreseeable to a reasonable person in the same position as the defendant you must give the defendant the benefit of that doubt and find him not guilty.'

"Defense counsel also requested that the court give the following special instruction:

'An adult has a fundamental right to control decisions relating to his own health care, including the decision to have life sustaining treatment withheld or withdrawn.

'However, this right shall not be construed to condone, authorize, or approve mercy killing, assisted suicide, or euthanasia.

'This right is not intended to permit any affirmative or deliberate act or omission to end life other than the withholding or withdrawing of health care pursuant to an advanced directive, or by a surrogate so as to permit the natural process of dying.

'Euthanasia in California is neither justifiable nor excusable.'

"In support of his requested instructions, defense counsel argued that 'it's [the] defense's posture that the actions of Dr. Kennedy were independent intervening acts which cut[] off the liability of Mr. Barkacs in this matter.'  Defense counsel argued that California case law had established the concept of independent intervening acts in the criminal law context, and contended that the proposed modified versions of CALJIC Nos. 3.40 and 3.41 properly stated California law regarding independent intervening acts.  Defense counsel maintained that the proposed instructions were necessary because there was no standard CALJIC instruction pertaining to such acts.

"As to the requested special instruction, defense counsel argued that it was the defense's position that 'Dr. Kennedy's order for the administering of 20 milligrams of morphine after the respirator was disconnected was an independent intervening cause and it was an unlawful act.'  Defense counsel argued that for this reason, the jury should be instructed regarding the illegality of euthanasia in California.

"The prosecutor objected to the defense's requested instructions.  The prosecutor claimed that the law regarding causation was already addressed in the standard CALJIC instructions, and that the proposed instructions would be potentially confusing to the jury.

"The trial court denied the request to give the proposed instructions, stating in part:

'I'm going to refuse the special defense instructions.  Specifically, I have a comment that I would like the record to reflect as to why I'm refusing the instructions concerning the definition of euthanasia, and that it is unlawful in California with the Probate Code sections being cited.  It's the court's belief that whether the deci

sions of Dr. Kennedy and the victim's family members were lawful or unlawful decisions, that fact is not [germane], in my view, to factual issues before this jury.  Whether labeled 'comfort care,' or labeled 'euthanasia,' the evidence is what the evidence is.  The jury's role in determining what the cause of death was will not be aided, in my view, by providing them statutory law on euthanasia in California.  CALJIC 8.57, in my view, adequately addresses these issues, and it, along with 3.40 and 3.41 are, in my view, adequate to instruct the jury in this regard.'

"The trial court instructed the jury pursuant to CALJIC No. 3.40 as follows:

'To constitute the crime of murder there must be in addition to the death, as I just said, an unlawful act which was a cause of that death.

'The criminal law has its own particular way of defining cause.  A cause of the death is an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act the death and without which the death would not occur.'

"The trial court also instructed the jury pursuant to CALJIC No. 3.41 as follows:

'There may be more than one cause of the death of Pablo Cruz.  When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the result.  A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death.

'If you find that the defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person, even the deceased person, contributed to the death.'

"In addition, the court instructed the jury pursuant to CALJIC No. 8.57 as follows:

'Where the original injury is a cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that the treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility.

'Where, however, the original injury is not a cause of the death and the death was caused by medical or surgical treatment or some other cause, then the defendant is not guilty of an unlawful homicide.' "

(Lodgment 2 at 8-13)

///

1    *3. Applicable Law on Habeas Review*

2            The due process right to a trial requires that criminal defendants be given a "meaningful

3    opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984).  An

4    integral part of this meaningful opportunity is the right to jury "as to any recognized defense for which

5    there exists evidence sufficient for a reasonable jury to find in his favor."  Matthews v. United States,

6    485 U.S. 58, 63 (1988); See also Bradley v. Duncan, 315 F.3d 1091, 1098 (9th Cir. 2002) (holding that

7    failure of the trial court to instruct jury as to the legal effect of an entrapment defense unconstitutionally

8    deprived petitioner of due process rights since there was sufficient evidence that supported the

9    entrapment theory); Conde v. Henry, 198 F.3d 734 (9th Cir. 1999) (holding that refusal of the trial court

10   to instruct on lesser offense of simple kidnapping was an unconstitutional deprivation of petitioner's due

11   process rights).  However, in order to merit federal habeas relief, alleged errors in state court jury

12   instructions must have "so infected the entire trial that the resulting conviction violates due process."

13   Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citing Cupp v. Naughten, 414 U.S. 141 (1973)).

14           Furthermore, the Ninth Circuit has held that the failure to instruct on a defense theory of the case

15   is only grounds for habeas relief if the theory is legally sound and there is supporting evidence for the

16   theory.  Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir. 2004), U.S. v. Scott, 789 F.2d 795 (9th Cir.

17   1986).  Additionally, even if there was a failure to instruct on an applicable defense theory, on federal

18   habeas review of a state court conviction, the petitioner must "show that the alleged error had a

19   substantial or injurious effect on the verdict."  Beardslee, 358 F.3d at 578; see also Brecht v.

20   Abrahamson, 507 U.S. 619, 637 (1993).

21   *4. Adjudication was neither contrary to, nor an unreasonable application of, clearly established federal*

22   *law*

23           The determination of the legal validity of a defense theory will rest on interpretations of state

24   criminal law.  A federal court is bound by the state court's interpretations of state law.  Wainwright v.

25   Goode, 464 U.S. 78, 84 (1983); see also, Hicks v. Feoick, 485 U.S. 624, 629 (holding that a federal

26   habeas court is bound by the state court's determination of state law). Applicable California law holds

27   that only *unforeseeable* events which are the *sole* cause of death will be considered independent,

28   superseding causes and, thereby, break the chain of causation for criminal homicide liability.  People v.

1   <u>Funes</u>, 28 Cal. Rptr. 2d 758, 769 (Cal. Ct. App. 1994).  Consequently, the California Supreme Court has

2   held that only grossly improper treatment that is the sole cause of death will act as an independent

3   intervening cause to break causal liability.  <u>People v. Roberts</u>, 2Cal.4th 271, 295 (Cal. 1992).

4        In reviewing the propriety of the trial court's decision to deny the special defense modifications

5   to the standard CALJIC jury instructions, the state appellate court held that "there was no evidence

6   presented that gross medical negligence was the *sole* cause of Cruz's death, as is required under

7   California law in order to constitute an independent intervening act." (Lodgment 2 at 16) (emphasis in

8   orig.).  In so concluding, the state appellate court focused on the defense expert's own testimony that the

9   cause of death was "acute–respiratory depression due to acute morphine toxicity *due to blunt impact to*

10  *the head*," and implicitly concluded that there was insufficient evidence for a reasonable jury to find in

11  Petitioner's favor.  (Lodgment 2 at 16).  As such, the state appellate court correctly determined that

12  applicable federal law required both a legally sound defense theory and evidence in support of that

13  theory in order to require the proposed defense jury instructions.  <u>Beardslee</u>, 358 F.3d at 577.  Although

14  the state appellate court made no direct citations to any applicable federal law, none are necessary in

15  order to hold that the reasoning and result are in conformity with clearly established federal law.  <u>See</u>

16  <u>Early v. Packer</u>, 537 U.S. 3, 8 (2000) (holding that a state court need not explicitly cite to, or even be

17  aware of, the controlling federal law as long as the reasoning and result are in conformity with the

18  applicable federal law).

19       The state appellate court's holding was not an unreasonable application of clearly established

20  federal law.  As held by the Ninth Circuit in <u>Beardslee</u>, in order to warrant federal habeas relief a

21  petitioner must show the alleged error in jury instructions had a "substantial or injurious effect on the

22  verdict."  358 F.3d at 578.  Beardslee was convicted of two counts of first degree murder when he was

23  found, along with several others, to have fatally shot one victim and fatally cut the throat of a second

24  victim.  <u>Id.</u> at 565-66.  At trial, Beardslee attempted to set forth a defense of mistake of fact, claiming

25  that he believed both victims were already dead when he delivered the final blow. <u>Id.</u> at 577.  However,

26  evidence presented at trial also showed that Beardslee believed he was putting the victims out of their

27  misery and ending their suffering. <u>Id.</u> at 565-66.  On habeas review, the Ninth Circuit denied relief and

28  upheld the conviction since the proposed defense theory would not provide a complete defense and a

significant amount of evidence had contradicted the defense theory.  Id. at 578.  The Ninth Circuit noted that Beardslee's involvement would be sufficient to hold him liable for the murders independent of who dealt the final blows. Id. at 577.  Additionally, Beardslee's initial statements to investigators that he wanted to end the victims' misery and forensic evidence introduced at trial showing that the victims were still alive when Beardslee dealt his blows contradicted his mistake of fact defense. Id. at 578. Consequently, the Ninth Circuit denied habeas relief because Beardslee failed to demonstrate that the failure to properly instruct the jury had "a substantial or injurious effect on the verdict." Id.

Similarly, Petitioner's defense theory would not have provided a complete defense; nor was it supported by the evidence.  As previously noted, in order to completely absolve Petitioner of criminal homicide liability, the subsequent medical treatment given by Dr. Kennedy would have to be grossly improper, thereby constituting an unforeseeable cause and the sole cause of death.  However, the evidence in the record, established by the defense's own expert witness, was that the "*cause of death was acute–respiratory depression due to acute morphine toxicity due to blunt impact to the head*.  In other words, the *bottom line* is the *blunt impact to the head*, if it wasn't from that, then it wouldn't have started." (Lodgment 5, Reporter's Transcript, Vol. 6 at 657) (emphasis added).  Therefore, the state appellate court's opinion was neither contrary to, nor an unreasonable application of, federal law as articulated by the Ninth Circuit in Beardslee.  Moreover, the state appellate court's decision was not based on an unreasonable determination of the facts in light of the evidence presented by the defense's own expert that blunt impact to the head was a cause of Pablo Cruz's death.

*5. Conclusion*

For the foregoing reasons, the Court recommends that habeas relief be **DENIED** as to Petitioner's first claim.


**B. Petitioner is Not Entitled to Relief on his Second Claim**

*1. Summary of Arguments*

Petitioner alleges the trial court denied his due process rights and right to trial by an impartial jury when the court refused to excuse Juror No. 5 during trial.  Specifically, Petitioner alleges the discovery of Juror No. 5's extensive contacts with prosecutors, law enforcement personnel, and judges

1    exposed her bias in favor of the prosecution, thereby depriving Petitioner of his right to a trial by an

2    impartial jury of twelve members. (Pet. at 10; Traverse at 5-6).

3         Respondent asserts reversal is not warranted since Petitioner failed to meet his burden under

4    McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984), to prove the juror's answer

5    given on *voir dire* in response to a material question  was dishonest and, if correct, would have provided

6    the basis for a challenge for cause.. (Ans. at 16-17).

7         The California Court of Appeals, on direct review of Barkacs' conviction, held that Juror No. 5

8    did not improperly withhold information during *voir dire* and there was nothing in the record supporting

9    a finding of bias.  (Lodgment 2 at 21-23).

10   *2. Summary of Relevant Facts*

11        The following statement of facts is taken verbatim from the unpublished opinion of the appellate

12   court affirming Petitioner's conviction on direct review, and is to be presumed correct. 28 U.S.C.

13   §2254(e)(1); See also Sumner, 449 U.S. at 545-47.

14

15         "During *voir dire*, the court asked for a show of hands from all persons
       who were seeking to be excused from the case due to a last minute scheduling
16     emergency or some other hardship.  Eight to 10 jurors raised their hands.  The
       court dismissed the remainder of the panel for a recess and spoke with the jurors
17     who were seeking to be excused from the case, in groups of two.
           "Juror number 5 informed the court that she had 'a little bit different
18     issue' and that she 'wanted to clarify it.'  She said that she had met the prosecutor
       on one occasion at a community function.  Juror number 5 estimated that the
19     function had taken place 'less than six months ago.'  She explained that she sat
       across from the prosecutor at the same table.  Juror number 5 said that she did not
20     know anything about the prosecutor, his reputation, or his cases.  She also stated
       that she knew the prosecutor's wife, and that she had seen the wife at community
21     events 'quite often.'  Juror number 5 explained that she had known the prosecu-
       tor's wife for between three and five years, but that she had never done anything
22     with her 'casually.'
           "The court asked juror number 5, 'Do you think you might maybe bend
23     over backwards to be fair to the defense because of this, or perhaps favor [the
       prosecutor's] side of the case, any possibility of any of that going on at all?'
24     Juror number 5 responded, 'I don't think so.'
           "The court then allowed the prosecutor and defense counsel to question
25     juror number 5.  The prosecutor established that juror number 5 knew his wife
       through social functions involving the Chamber of Commerce.
26         "Defense counsel asked juror number 5, '[W]ould you want someone of
       your mindset sitting on a trial with your knowledge of [the prosecutor and his
27     wife] if you were on a trial?'  Juror number 5 responded, 'I don't think it
       makes...I don't think it would make any difference.  Unfortunately, I know
28     several attorneys and some judges, so...'  The court interrupted by quipping,
       'Well, that's not so unfortunate.'  Juror number 5 continued, 'Well, okay.  Sorry.

                                            13

But just because I am active in the community, so that's the only reason.' Immediately thereafter, defense counsel stated that he had no further questions.

"As *voir dire* continued, the court stated, 'And because I want to find out whether any of you are acquainted with or have even seen or know anything about any of these individuals, [juror number 5] aside, is there anyone who is acquainted with or knows or has ever seen before the deputy D.A. in this case...?' Later during the *voir dire*, the court asked the prospective jurors, 'How many of you currently have close friends or relatives who are police officers, prosecutors, or criminal defense attorneys?' Juror number 5 did not indicate that she had any such 'close friends or relatives.'

"After the third day of trial, outside the presence of the jury, the prosecutor informed the court that a deputy district attorney named Wes Schermann had brought to the prosecutor's attention that he was in the same Rotary Club as juror number 5. The prosecutor stated, 'apparently [juror number 5] forgot to bring that up or doesn't know that deputy very well.' The prosecutor continued, 'But the deputy thought that [juror number 5] was quite familiar with him, so I wanted counsel and your honor to know a deputy district attorney is in Rotary Club with juror number 5.' The court asked defense counsel if he would like the court to examine juror number 5 regarding the issue. Defense counsel responded in the affirmative.

"Outside the presence of the remainder of the jury, the court asked juror number 5 a series of questions regarding her relationship with Deputy District Attorney Schermann. Juror number 5 acknowledged that she was in the same Rotary Club as Schermann. The court then asked, 'That's not something that you divulged when we asked early on in jury selection whether you knew anybody who was in the law enforcement field or worked for a prosecutor's office or anything like that. Is it something you just forgot?'

"Juror number 5 responded, 'Well I thought you were asking more if it was someone I socialized or really knew. I mean I can go through a whole bunch of policemen...that I know who they are, but I don't know them.' Juror number 5 explained further that she had been in the same Rotary Club with Deputy District Attorney Schermann for a year or so. However, juror number 5 said that she did not 'see him socially' and that she 'really [did not] know him at all personally.' Juror number 5 continued, 'But if we're doing this...ex-chief Davis [of the El Cajon police department] is a member of the Rotary Club, too.' Juror number 5 stated that she did not talk with Davis about his cases and that she considered him to be a 'co-member' of the Rotary Club rather than a 'friend.'

"The court allowed the prosecutor and defense counsel to question juror number 5. Defense counsel stated, 'You indicated that you could have given us a list of law enforcement people that you know, but don't associate with; is that a correct statement?'

"Juror number 5 responded, 'Well through–I am a banker, and part of my job is to be out in the community. I belong to Rotary. I'm active a little bit in the Chamber [of Commerce]. I'm active in downtown El Cajon with the finance committee. So, I run across a lot of different people just in business.' Juror number 5 stated that Judge Charles Ervin was a former member of the Rotary Club, and that a police officer named James Cunningham had attended Rotary Club meetings on occasion. Defense counsel said that he had no further questions.

"The prosecutor asked juror number 5, 'Is there anything about your relationship with those individuals at Rotary that would prohibit you from being fair and impartial in judging the evidence that you hear during this trial?' Juror number 5 responded, 'Absolutely not.'

"Juror number 5 then left the courtroom. Thereafter, defense counsel requested that the court dismiss juror number 5 and replace her with an alternate juror. The court denied the request, noting that juror number 5 had answered all of the court's *voir dire* questions 'appropriately, honestly, and completely.' In

14

1  addition, the court stated, '[T]he distinction between having a close friend or
2  relative in law enforcement versus somebody that may be members of the same
   community group or club as her, is I think, a keen and clear distinction, and it
3  doesn't give rise, in this court's view, in the slightest to any type or [sic] bias,
   prejudice, or cause to excuse her as a juror."

4  (Lodgment 2 at 17-21)

5  *3. Applicable Law on Habeas Review*

6        The right to a trial by jury as guaranteed by the Sixth Amendment to the United States Constitu-

7  tion has been defined as the right to be tried by an impartial jury based solely on the evidence before

8  them.  U.S. CONST. Amend. VI; <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  When an allegation of

9  juror partiality is raised, the appropriate remedy is "a hearing in which the defendant has the opportunity

10  to prove actual bias."  <u>Smith</u>, 455 U.S. at 215; <u>See also</u>, <u>Remmer v. U.S.</u>, 347 U.S. 227, 229 (1954)

11  (holding that the appropriate course of action in response to an allegation of juror misconduct is for the

12  trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was

13  prejudicial, in a hearing with all interested parties permitted to participate.").  When a juror's mistaken

14  answer to a question on *voir dire* is the basis for the allegation of bias, the harmed party must prove 1)

15  the juror failed to provide an honest answer, 2) the question was material to the case, and 3) a truthful

16  answer would form the basis for a challenge for cause.  <u>McDonough</u>, 464 U.S. at 556.  Only when

17  dishonest answers to *voir dire* questions"bespeak a lack of impartiality" can a constitutional violation be

18  found.  <u>Dyer v. Calderon</u>, 151 F.3d 970, 973 (9th Cir. 1998) (citing <u>McDonough</u>, 464 U.S. at 555-56).

19  The subsequent determination of whether the juror was honest or not, and consequently whether the

20  juror is biased or not, will be a determination of fact.  <u>Dyer</u>, 151 F.3d at 973.  On habeas review, such

21  determinations of fact will only be disturbed upon a showing of clear error.  28 U.S.C. §2254(d)(2);

22  <u>Riley v. Paine</u>, 352 F.3d 1313, 1317 (9th Cir. 2003).

23  *4. Adjudication was neither contrary to, nor an unreasonable application of, clearly established federal*
24  *law*

25        In conforming to California law on direct review, the state appellate court held that no evidence

26  existed in the record to support a finding of improper bias on the part of Juror No. 5.  (Lodgment 2 at

27  21-23).  Guiding the court's determination was the recognition that a criminal defendant has the right to

28  a trial by an unbiased and unprejudiced jury.  (Lodgment 2 at 21 (citing <u>People v. Nesler</u>, 16 Cal.4th

   561,

15

1   578 (Cal. 1997)).  California law holds that on appellate review of a trial court's decision not to excuse a

2   seated juror, bias will not be presumed and relief will only be granted if the record shows the juror's

3   inability to perform was a demonstrable reality.  People v. Jablonski, 37 Cal.4th 774, 807 (Cal. 2006)

4   (citing CAL. PENAL CODE §1089).

5          With these governing rules in mind, the state appellate court reviewed the record in an attempt to

6   ascertain whether Juror No. 5 had "concealed" information during *voir dire*, thereby raising a presump-

7   tion of prejudice (See People v. Carter, 36 Cal.4th 1114, 1208 (Cal. 2005)), or whether there was

8   another basis for inferring bias. (Lodgment 2 at 22-23).  In holding there was no concealment of

9   information, the appellate court took note of the facts that Juror No. 5 had freely acknowledged her

10  association with several law enforcement personnel and prosecutors but stated that this association was

11  limited to common membership in the Rotary Club (Lodgment 2 at 22).  Consequently, the appellate

12  court held that since none of these associations rose to the level of "close friend or relative," there was

13  no obligation to disclose in response to the *voir dire* question and no concealment of information.

14         Without explicitly acknowledging it, the state appellate court conformed with the applicable

15  federal standard for determining whether a juror's response to a *voir dire* question was dishonest.  The

16  Ninth Circuit, reviewing the denial of habeas relief, was presented with a challenge to the partiality of a

17  juror in a state criminal matter.  Dyer, 151 F.3d at 973.  The Ninth Circuit's inquiry was "whether [the

18  juror's] answers were dishonest and, if so, whether this undermined the impartiality of [petitioner's]

19  jury." Id.  The state appellate court in the instant matter employed this very analysis when it analyzed

20  Juror No. 5's answer about concealment of information. (Lodgment 2 at 21-23).  That state appellate

21  court concluded a presumption of prejudice was not warranted because Juror No. 5's answer was

22  truthful. (Lodgment 2 at 21-23).  Therefore, the state appellate court reasoned in conformity with clearly

23  established federal law.

24         Estrada v. Scribner involved a habeas petition seeking relief on the grounds of improper juror

25  bias. 512 F.3d 1227, 1234 (9th Cir. 2008).  The petitioner there alleged a relationship between a juror

26  and the decedent's family had improperly influenced the juror, in spite of the fact that the juror had

27  disclosed the relationship during *voir dire* and affirmatively stated the relationship would not affect his

28  ability to be fair.  Id. at 1234.  In affirming a denial of the habeas relief, the Ninth Circuit deferred to the

findings of the trial court that the juror was not biased-in-fact.  Id. at 1240.  Thereafter, the court noted that, although bias may be implied in extraordinary circumstances[2], the petitioner failed to persuade the court bias should be implied in that case.  Id. at 1240-41.

Essentially mirroring the analysis of the Ninth Circuit, the state appellate court determined ,the record did not support a finding of bias.  The court emphasized there was nothing in the record to indicate Juror No. 5 had a close, personal relationship with any of the individuals she mentioned, Juror No. 5 affirmatively reinforced her ability to remain impartial, and Juror No. 5 voluntarily and fully disclosed the nature of her relationship with the prosecutor and his wife during *voir dire* and was not met with a defense peremptory challenge.  (Lodgment 2 at 22-23).  As such, the court held the record was devoid of evidence that Juror No. 5 was improperly biased.  The state appellate court's ruling was not contrary to clearly established federal law.  In addition, the state appellate court's adjudication was not based on an unreasonable determination of the facts in light of the evidence that Juror No. 5 did not conceal the nature of her relationship with the prosecutor or his wife, had no other close or familial relationship with law enforcement, and reaffirmed her ability to be impartial.

*5. Conclusion*

For the foregoing reasons, the Court therefore recommends that habeas relief be **DENIED** as to Petitioner's first second claim.


**C. Petitioner is Not Entitled to Relief on his Third Claim**

*1. Summary of Arguments*

Petitioner alleges the trial court's decision to allow the prosecutor to ask Calvin Pete whether he was being uncooperative due to a fear of retaliation from Petitioner's family unduly prejudiced Petitioner's case and constitutes a deprivation of due process under the Fourteenth Amendment to the U.S. Constitution.  (Pet. at 11; Traverse at 6-7).

---

[2]  The Ninth Circuit, quoting a previous opinion, noted that bias may be implied in the following circumstances: 1) juror is aware of unusually prejudicial information concerning the defendant; 2) existence of a certain relationship between the juror and the defendant; 3) juror's, or a close relative's, personal involvement in a factually similar situation; or 4) juror is employed within the prosecuting agency, a close relative with one of the participants, or personally involved in the underlying transaction. Estrada, 512 F.3d at 1240 (citing Coughlin v. Tailhook Ass'n, 112 F.3d 1052, 1062 (9th Cir. 1997).

07cv2139 JAH (WMc)

1   Respondent asserts that errors in state evidentiary rulings can only form a basis for habeas relief

2   if the error "rendered the proceeding so fundamentally unfair that it violated due process." (Ans. at 19).

3   As such, Respondent asserts that the state court of appeal's reasoning properly considered the *de*

4   *minimis* impact of the single question and, consistent with federal law, held that the question did not

5   warrant relief.

6   The California Court of Appeal, in an unpublished opinion, held that any error in overruling the

7   defense objection and allowing the question and answer was "harmless under any standard of prejudice"

8   and denied relief on this ground.  (Lodgment 2 at 27).

9   *2. Summary of Relevant Facts*

10   The following statement of facts is taken verbatim from the unpublished opinion of the appellate

11   court affirming Petitioner's conviction on direct review, and is to be given the presumption of correct-

12   ness. 28 U.S.C. §2254(e)(1); See also Sumner, 449 U.S. at 545-47.

13

14   "During direct examination, Pete testified that he could not recall whether
he had any discussion with Barkacs and William at William's motel room after

15   the incident.  Pete also stated that he did not recall seeing Barkacs fill a Gatorade
bottle with gasoline at a gas station after Pete and Barkacs left William's motel

16   room.

17   "After a lunch recess, outside the presence of the jury, the prosecutor
informed the court that during the recess, he and a detective had a discussion with
Pete during which Pete admitted that 'he was being less than honest regarding his

18   testimony.'  The prosecutor stated that Pete had reluctantly agreed to testify
honestly when he returned to the witness stand.

19   "On redirect examination, the prosecutor asked Pete the following ques-
tions:

20

21   '[The prosecutor:] Mr. Pete, you weren't exactly honest in answer-
ing my questions this morning, were you?

22   '[Pete:] Not exactly.
'[The prosecutor:] Why not?

23   '[Pete:] I don't know.
'[The prosecutor:] Was one of the reasons you feel sorry for your
friend Jimmy Barkacs?

24   '[Pete:] Something like that.
'[The prosecutor:] Okay.  Is something like it [*sic*] you don't think

25   he had the intent to kill the owner of that car, Pablo Cruz, correct?
'[Pete:] Yes, that's correct.

26   '[¶]...[¶]
'[The prosecutor:] Is another reason you weren't completely

27   honest this morning [that] you were somewhat concerned about
retaliation from members of Jimmy Barkacs's family?

28   '[Defense counsel:] Objection, your honor.
'The court: Overruled.  You can answer, if you know.

18

'[Pete:] That wasn't exactly the main concentration of it, but that just has everything to do with me even being here in the first place, you know what I'm saying?  But–
'[The prosecutor:] I'm sorry.  Go ahead.
'[Pete:] That wasn't exactly the reason.  I just didn't say anything probably just because it sounds bad that I took him to get gas.
'[The prosecutor:] Okay.  When I asked you this morning if you remembered taking him to get gas, you said you couldn't remember.  You do remember, don't you?
'[Pete:] Yes.'

"Pete then admitted that he heard William tell Barkacs to burn the car, and that he drove Barkacs to a gas station and saw Barkacs fill a Gatorade bottle with gasoline."

(Lodgment 2 at 24-25)

*3. Applicable Law on Habeas Review*

Clearly established federal law holds that errors in the admission or exclusion of evidence is generally not a valid basis for federal habeas relief.  Charlton v. Kelly, 229 U.S. 447, 457 (1913).  However, a constitutional error may be found, thereby warranting habeas consideration, if the error "created an absence of fundamental fairness that 'fatally infected the trial'."  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996) (citing Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)); Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008).  Furthermore, even if error is found, in order to merit habeas relief, the error must have "had [a] substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 622.  To make this showing, the petitioner bears the burden of establishing that the error resulted in actual prejudice.  Id. at 638.

*4. Adjudication was not contrary to, nor an unreasonable application of, clearly established federal law*

For the sake of argument, the state appellate court assumed the trial court erred in overruling the objection to the prosecution's question concerning a possible threat of retaliation from petitioner's family. (Lodgment 2 at 25).  Proceeding immediately to the error analysis, the state appellate court then held the "error" was "harmless under any standard of prejudice."  (Lodgment 2 at 26).  In reaching this conclusion, the court first noted the undisputed evidence against Petitioner as to the murder and carjacking charges and the substantial amount of circumstantial evidence independent of the evidence contributed by witness Calvin Pete.  (Lodgment 2 at 26).  Then, the court noted the prejudicial question was a single question which was denied by the witness and cured by limiting instructions stating

19

1    "[s]tatements made by the attorneys during trial are not evidence" and admonishing the jurors to "not

2    assume to be true any insinuation suggested by a question asked to a witness." (Lodgment 2 at 26;

3    Lodgment 5, Reporter's Transcript, Vol. 7 at 735-736).

4            In undertaking this harmless error analysis, the state appellate court conformed to clearly

5    established federal law.  It implicitly noted that alleged evidentiary error may provide a basis for relief,

6    but no relief was warranted in Petitioner's case because the error was harmless.  Federal law provides

7    that evidentiary error may merit relief but requires that the error amount to a deprivation of the

8    constitutionally guaranteed right to due process; harmless trial court errors do not merit habeas relief.

9    See Brecht, 507 U.S. at 629-630.

10           Furthermore, the state appellate court was not unreasonable in its application of federal law to

11   Petitioner's claim.  By noting the weight of the evidence against the Petitioner and considering the

12   circumstances surrounding the single contested question, the court essentially evaluated whether the

13   allowance of the question and the admission of the answer into evidence had a substantial injurious

14   effect on the jury's verdict.  (Lodgment 2 at 23).  This is exactly the question which must be considered

15   on a collateral attack to state court conviction based on an evidentiary ruling.  Brecht, 507 U.S. at 637-

16   38.  Considering there was only a single question, which was presented on re-direct examination, and

17   immediately denied by the witness, the state appellate court concluded the question did not have a

18   substantially injurious influence on the jury's verdict.  (Lodgment 2 at 23).

19           Controlling Ninth Circuit authority[3] undermines the force of Petitioner's claim even further.  The

20   Ninth Circuit, in denying habeas relief on the grounds of an alleged improper admission of threats into

21   evidence, held no federal relief is warranted as long as the threat is not particularly inflammatory or

22   macabre and the state trial court gives proper limiting instructions.  Ortiz-Sandoval, 81 F.3d at 898.  The

23   Ninth Circuit also noted that any error was harmless because the undisputed evidence presented at trial

24   supported a conviction.  Id.  Moreover, the Ninth Circuit is extremely reluctant to grant habeas relief on

25   the grounds of alleged errors in evidentiary rulings.  See Polk v. Sandoval, 503 F.3d 903, 908-09, fn.4

26   (9th Cir. 2007) (holding that claim for habeas relief on grounds of improper admission of threat

27

28           [3]  Petitioner's reliance on Dudley v. Duckworth is misguided.  854 F.2d 967 (7th Cir. 1988).  This court may look to the
     decisions of other circuits for guidance, but it is only bound by the opinions of the Ninth Circuit and the U.S. Supreme Court.  Gunther v.
     Washington County, 623 F.2d 1303, 1319 (9th Cir. 1979).

07cv2139 JAH (WMc)

1  evidence against decedent lacks merit); <u>Fields v. Woodford</u>, 309 F.3d 1095, 1107 (9th Cir. 2002)

2  (holding that even when improperly introduced evidence was stricken from the record and the jury

3  instructed to disregard it, habeas relief is not warranted when other evidence of defendant's guilt is

4  overwhelming).

5       In the instant case the alleged error concerned the overruling of a defense objection to the

6  prosecutor's question: "Is another reason you weren't completely honest this morning you were

7  somewhat concerned *about retaliation from members of Jimmy Barkacs' family*?" (Lodgment 5,

8  Reporter's Transcript, Vol. 4 at 329) (emphasis added).  This was a single question which was neither

9  inflammatory nor macabre.  The question was not evidence and the jury was specifically instructed that

10  questions by the attorneys, or any insinuations that may be inferred from questions, were not evidence.

11  (Lodgment 5, Reporter's Transcript, Vol. 7 at 735-736).  Additionally, there was, as noted by the state

12  Court of Appeal, undisputed evidence of Petitioner's guilt on the murder and carjacking charges, and

13  strong circumstantial evidence of guilt as to the arson charge. (Lodgment 2 at 26).  As such, the Court of

14  Appeal did not unreasonably apply clearly established federal law to Petitioner's case.  Moreover, the

15  state appellate court did not base its decision on an unreasonable determination of the facts in light of

16  the limiting instruction given by the trial judge and witness Calvin Pete's negative answer to the

17  question asked by the prosecutor.

18  *5. Conclusion*

19       For the foregoing reasons, the Court therefore recommends that habeas relief be **DENIED** as to

20  Petitioner's third claim.

21                          **VI.  CONCLUSION & RECOMMENDATION**

22       For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an

23  Order: (1) adopting this Report and Recommendation, and (2) directing that Judgment be entered

24  denying the Petition.

25       **IT IS ORDERED** that no later than **November 26, 2008** any party to this action may file

26  written objections with the Court and serve a copy on all parties.  The document should be captioned

27  "Objections to Report and Recommendation."

28  ///

///

07cv2139 JAH (WMc)

1 | ///

2 |     **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

3 | served on all parties no later than **December 11, 2008**.  The parties are advised that failure to file

4 | objections within the specified time may waive the right to raise those objections on appeal of the

5 | Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d

6 | 1153, 1156 (9th Cir. 1991).

7 |

8 | DATED: October 30, 2008

9 |

10 |

11 |                 Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court